Good morning, Your Honors. My name is Cynthia Kagiwata. I'm representing defendant appellant Pilialoha Teves. May it please the Court, there are two main issues in this appeal. The first one concerns Ms. Teves' constitutional right to a fair trial and whether there's a reasonable possibility that her verdict was affected by extraneous evidence because the jury was exposed to two instances of extraneous information. The first one on the third day of trial involved some members of the audience were escorted out of the courtroom and they started cursing and shouting at the court or at the jurors in Hawaiian and English and at least eight members of the jury saw this instance. The other instance involves one juror on the fourth day of trial brought to the court's attention that his notebook had the word guilty imprinted or indented on the cover and he had shared that information with at least two other jurors. Ms. Kagiwata, what do we do with the fact that the district court conducted an evidentiary hearing on both of the issues that you appeal and rendered findings that were adverse to the position you are now arguing? Don't we have to find that those findings are clearly erroneous before we can grant relief here? Well, yes, to the extent that the district court made the proper findings, but the district court did not inquire into the effect on the jurors, at least especially with the guilty notebook. Well, let's start with the outbursts. He did make findings, did he not, that your client essentially controlled or was, I don't know what the legal word would be, I'll use the vernacular, was in cahoots with the people who were conducting the outbursts. In other words, they were her supporters. Well, to be clear about that, the court found that the protesters or the people who were escorted out of the courtroom were connected with the co-defendant, Ms. Ventura Oliver. There was absolutely no finding that these people were connected to. But there was a finding because the district court asked each prospective juror who had heard any portion of the outbursts whether they could remain fair and impartial and not hold the fact of the outbursts against either party. Is that right? The court did make that inquiry, yes. And how can we overturn that finding as clearly erroneous? What evidence would you point us to that would compel a reasonable fact finder to conclude the other way? Well, the district court was intent on advising the jury from the beginning that he was going to tell each juror this outburst had absolutely nothing to do with the parties in the case, which is what he did. That's not my question. Okay. My question is, what evidence do you have that is contrary to the district court's factual determination that you would point us to so that we could then declare that the district court's findings of fact were clearly erroneous? Okay, I understand. Okay. Well, for the juror who reported the matter to the clerk, he reported that he felt very intimidated and threatened. And this was after five days went by between when he saw the incident and when he came back and reported that he felt very threatened and very intimidated. Now, the court did advise that juror, I'm telling you this has nothing to do with the case. You should disregard it. And then he had him in there a couple of times asking, can you be fair and impartial. He kind of equivocated, and the case law suggests that if even one juror felt intimidated or threatened, that could impact the verdict. But even if the juror equivocates, the district court here pressed further, and the juror made an affirmative declaration that he could be fair and impartial. So it seems to me that what you're arguing essentially is that you want us to reweigh the facts and come out opposite to that factual conclusion that the trial judge made. And I'm not sure that the law permits us to do that on appeal. Okay. Well, I think it also depends on whether the court is looking at this as a matter of extraneous information or an ex parte contact, as the government suggests. Because if it is a matter of extraneous information, the government has the burden of showing that there was no reasonable possible effect that influenced the verdict. Well, what's the new evidence, counsel, for it to be extraneous evidence? It has to be new evidence, does it not? What new evidence does the outburst represent? Well, because it was connected to the case. Well, it's connected to the case only in the sense they were in the courtroom. But extraneous evidence is quite different than ex parte evidence. I mean, some of the jurors here suggested that they were annoyed by it. They didn't understand what the problem was. Some said it was intimidating. But nobody said, well, hearing this, it made me think I ought to find the defendant guilty or not guilty. It had, as far as I can tell, unless you convince me to the contrary, it was not new evidence. Why should we treat this as extraneous evidence instead of ex parte evidence? Well, because my understanding of the case law, as Rosenthal stated, is it has to have some impact on a fact in controversy or the law. How did it do that in this case? The entire case had to do with this program having to do with helping Native Hawaiians. And Ms. Teves' entire defense was based on she did not intend to defraud anybody because she was a Native Hawaiian who was helping others. Ms. Ventura Oliver, her co-defendant, had a long history of teaching and helping people to restore their land rights for Native Hawaiians. The fact that these people were in the courtroom, and the judge noted they were in the first row, they were Native Hawaiians, they were escorted out of the courtroom for unknown reasons to the jury, but they were clearly upset that they were cursing in Hawaiian and in English. And even the judge found that it's possible there was some correlation between the outburst and the Native Hawaiians. I don't remember the judge finding that. Where is that in the record? In the excerpts of Record Volume 3, 489 to 90, Judge Seabright was conducting voir dire with one juror who was Native Hawaiian and expressed an interest and said that she was embarrassed because she was also Native Hawaiian. And if I could have a minute, I could give the court the exact quote. Either that or you can send it in a 28-day letter. I don't want to take up your time. I'm struggling to see where this is new evidence. That it was upsetting to somebody, I get that, but that's ex parte. Where's the new evidence? That's what I'm struggling with. Why is this new evidence? Well, I was not aware that it had to be new. My understanding was that it had to be related to the case, to a case, either the facts or the law. If that's so, then what's ex parte, an ex parte contact? What's the difference between the two? Well, ex parte contact has absolutely nothing to do with any of the law or the facts in the case. And the government cited quite a few examples. That's what I'm struggling with in this thing. What does the outburst have to do with the law or the facts in this case? Because they were Native Hawaiians, they were protesting, they were obviously upset. Several members of the audience had identified them as being, I'm sorry, several members of the jury had identified them as being members of the audience. And the entire fabric of the case, both from the government's perspective and the defense, had to do with Native Hawaiian issues and being Native Hawaiian activists and protesting the way Native Hawaiian land rights have been taken from Native Hawaiians. But with respect, counsel, there are many circumstances where members of, I guess, Native Hawaiians are a minority group in the state of Hawaii, but the reality is you can have African Americans, you have Hispanics, whatever, in a particular community or members of certain religious communities that may be considered minorities. So there's a criminal offense, and somebody that is involved in that particular group is charged. That infects almost every trial. And so far as I can tell, the fact that there may be members of the audience who are members of the same minority group who are upset does not turn over the trial. Now they're excluded from juries and so on, that's a different issue. But here you simply have the fact that there was a protest, they went out, the judge very properly conducted a voir dire, as my colleague mentioned, specifically talked to each juror who was potentially impacted, each said that it would not impact an ability to go forward fairly. And as far as the outburst, I don't think anybody even quite understood what it was, what the point was. All of that taken together, at least in my mind, means that it's an ex parte contact as opposed to extraneous evidence. Can you help me? How do you bridge that gap? I think the gap is bridged because in this particular case, it had to do with, and I see I'm almost out of time, may I finish? Okay. I see that the entire case, the government's case, was based on this program being, a program geared towards Native Hawaiians. Both of the defendants' defense was based on the fact that they did not intend to defraud anyone, they intended to help other Hawaiians and restore them to their land rights. So very clearly, there was a correlation between Hawaiian activism going on, as demonstrated by the protesters, and the defense in the entire case. And I see that I'm out of time. Thank you, counsel. The time for your side has expired. Thank you. We will hear from the government. May it please the court, Your Honor, Larry Tong. I'm an assistant United States attorney here in Hawaii, and I'm representing the government. I think you're absolutely correct in focusing on what the standard of review should be. I think that's a critical issue here, and that turns on whether we are dealing with extrinsic evidence, as the defense contends, or whether we are dealing with ex parte contacts, which we submit occurred here. And Judge Smith, I believe you're right on point. There was absolutely no evidence that was to be derived out of either of the incidents that the defense complains about. If you break it down, what this case dealt with, from the defense standpoint, it may have been about Hawaiian rights. From the government standpoint, however, it was about a mail fraud scheme that grew out of a debt elimination scheme, whereby these defendants marketed bogus financial instruments, which they claimed could be used to relieve debt. And the critical issue from the government standpoint, as submitted to the jury, was whether the defendants acted with intent to defraud. Did they know? Did they have knowledge and intent that was criminal? And those were the issues before the court and before the jury. So here we are on the third day of trial, I believe it is, at the end, on the end of a week, and we have these two incidents occur. The first incident is these two spectators begin protesting after they are ejected. If I may, Judge Tallman, I want to make one clarification of the record. Judge Seabright did make comments that they appeared to be associated with the co-defendant, but those comments were not made in the presence of the jury. So while the jury – I was referring to the colloquy after the evidentiary hearing. Right. But earlier in the proceeding, he had talked to Ms. Ventura Oliver and says, I see that you are friends with them. Make sure that they abide by the court rules. And to a certain degree, I don't really know what they were protesting about either. The best I can derive out of it is that they were protesting the court's jurisdiction over them as Native Hawaiians, and that's what led to them being thrown out of the courtroom outside of the presence of the jury and this out-of-the-courthouse demonstration, which was witnessed by some of the jurors themselves. But the point was, none of the jurors were in the box. When Judge Seabright made any statement that, gee, there seems to be a connection between the defendant and these two speakers. I didn't mean to suggest that there was. I was just – I think I was discussing with opposing counsel the district court's factual findings on the record that essentially confirms what you just said. I guess one of the things that he mentioned that resonated with me was the policy about how we handle disruptive behavior in the courtroom, and particularly where the disruptive behavior stems from individuals who may be supporters of one or more of the defendants. I think he rightly observed that we have to be careful about sanctioning such conduct where we don't want to incentivize further disruptive behavior in the way that we handle these sorts of things. And that plays right into the, unfortunately, First Circuit case, Tejada, which we've cited, which involved a relative of one of the defendants that made a throat-slitting gesture that seemed by the jurors, and it led to a motion for a mistrial with some voir dire where the district court said no mistrial and the First Circuit affirmed. And in so doing, they said we don't want to incentivize defendants to create incidents that could be construed as extrinsic evidence, which would then shift the burden to the government to prove that it had no impact on the trial. I'm sorry. I'm sorry, Judge. If you're finished with that question, I have a different issue. I am, Judge O'Scanlan. I'm curious about this offset. Obviously, we don't want double counting, but as I read the record, it appears to me that the government concedes that there will be some credit given with respect to any assets that are sold as against the overall order. We so concede. You so concede. All right. So there's no issue with respect to that. Your Honor, as I believe the Casey case, which you authored, says, the forfeiture statute requires that the money judgment be imposed in a very specific amount, the gross proceeds of the fraud. That's what happened here. Judge Seabright even gave Ms. Tevis the benefit of reducing the total amount to reflect only the amount derived during her participation in the conspiracy. So the amount that was imposed is absolutely consistent with the Casey case, as reaffirmed by the Newman case, on which I believe, Judge O'Scanlan, you were on that panel as well. And we concede that under the prevailing law, or we would submit, rather, that under the prevailing law, the amount of the money judgment sets a cap on the recovery on that money judgment. That's the Masters case, which is out of circuit but cited in Newman, I believe. And thereby, there is going to be no double recovery because both the specific assets that were seized here and the money judgment were taken on the theory that they are all proceeds of the offense. So to the extent any of the assets are later forfeited, sold, and used, they will be used to reduce the money judgment. So by operation of law, she will get the reduction. There's no plain error because there's no case that requires that it be done in advance before the sale occurs, and there is no double recovery as a matter of law. So we submit that in the absence of controlling authority that is plain and obvious that would have required a judge as skilled as Judge Seabright to see that there should have been an automatic reduction without a request, there's just no plain error here. And the Toyota and the coins have yet to be sold, right? That's correct. I'm sorry, the first part, the Toyota? The Toyota has been sold, Your Honor. What about the coin? The coins have not. So the Marshall's Asset Forfeiture Unit is still overseeing them? It has been stayed by order of Judge Seabright pending the disposition of this appeal and the companion appeal. So once, assuming the judgments are affirmed, they will then be sold. And, of course, in today's market especially, the value of the gold is fluctuating. But I should also point out that if you look at the value of the assets that have been seized, even with the offset, the offset was far less than the total money judgment. So there's just no possibility of a double recovery here. And there's no plain error and there's no equal protection of violation, which coincidentally was raised for the first time in the reply. But equal protection doesn't mean that you get identical results, particularly where one defendant raised the issue and another did not. Counsel, would there be any benefit to our construing the district court's order to make clear the government's concession? There will be no double counting. So it doesn't change the result from your perspective. But since there is no controlling case law, would it be best to construe the meaning of the district court's order to that effect or would the government feel that there should be some clarifying case law on the issue? Well, number one, I think the court's order should be construed as permitting or requiring an offset of the money judgment by the value of assets that are later seized and sold. Whether that be through construction of this court or through some case law, I leave that to the court. I just want to make clear, though, that I think that the existing case law is the money judgment sets a cap and it's like a personal money judgment that can be essentially satisfied through any assets of the defendant, which would include the assets that were seized. Is this issue ripe for review? I think not because it's been stayed and we don't know the value and to the extent she is arguing double recovery, I'm in an awkward position of arguing an issue that was really never raised by this defendant before and we don't know what the ultimate value will be other than to say it won't exceed the amount of the money judgment. I was also thinking that if her worst case scenario occurred and for whatever reason the government refused to credit the proceeds from the sale of the assets and then sought other assets of the defendant, it seems to me that she would still have an opportunity to object to any recovery in excess of the amount of the judgment and if the district court refused to impose that cap, she could then bring another appeal and challenge that ruling at the time. Judge Tallman, you're absolutely right. In fact, the end of the order does say that the district court retains jurisdiction to deal with any later forfeiture issues that should arise. Anything further, Counsel? No, Your Honor. I'm happy to answer any other questions, but if the court has none, I say... No further questions. Thank you, Counsel. The case just argued will be submitted for decision and we will hear argument next in Guo and Hay v. Lynch.
judges: O'scannlain, Tallman, Smith